**UNITED STATES BANKRUPTCY COURT** Northern **DISTRICT OF** California

## PROOF OF CLAIM

Name of Debtor: Carole DePuydt Meier

Case Number: 11-42880

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
U.S. Bank, N.A., successor in interest to the FDIC as receiver for Downey Savings and Loan Association, F.A.

☐ Check this box to indicate that this claim amends a previously filed claim.

Name and address where notices should be sent:
U.S. Bank, N.A.
3121 Michelson Drive, Suite 500
Irvine, CA 92612

Telephone number: (602) 412-5117

**Court Claim Number:** ____________________
(If known)

Filed on: ____________________

Name and address where payment should be sent (if different from above):

Telephone number:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**1. Amount of Claim as of Date Case Filed:** $ 654,204.35

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

X Check this box if claim includes interest or other charges in addition to the principle amount of claim. Attach Itemized statement of interest of charges.

**2. Basis for Claim:** Note Dated 3/30/06
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** 6026 ( F.040-2572 )

**3a. Debtor may have scheduled account as:** US Bank
(See instruction #3a on reverse side.)

**4. Secured Claim:** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

**Nature of property or right of setoff:** ☒ Real Estate ☐ Motor Vehicle ☐ Other
**Describe:** 61 Rudgear Drive, Walnut Creek, California

**Value or Property:$**__________________ **Annual Interest Rate**_______**%**

**Amount of arrearage and other charges as of time case filed included in secured claim,**

**If any: $** 54,238.23 **Basis for perfection:** Note and Deed of Trust

**Amount of Secured Claim: $** 654,204.35 **Amount Unsecured: $**____________________

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim fails in one of the following categories, check the box and state the amount.**

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before filing of the bankruptcy petition or Cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. §507 (a)(5)

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or households use - 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(____).

**Amount entitled to priority:**

$________________

*Amounts are subject to adjustment on 4/10/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See instruction 7 and definition of "redacted" on reverse side.)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

Date: 04/28/11

**Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

**Prober & Raphael, A Law Corporation** **/s/ Joseph Garibyan**

**FOR COURT USE ONLY**

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571*

Case 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 1 of 49

Case Name: Carole DePuydt Meier

Unpaid Principal Balance: $ 599,966.12

Reinstatement:

| | |
|---|---|
| Monthly Payments from December 1, 2009 through May 1, 2010 at $2,765.44 | $ 16,592.64 |
| Late Charges at $142.49 | $ 854.94 |
| Monthly Payments from June 1, 2010 through November 1, 2010 at $2,265.46 | $ 13,592.76 |
| Late Charges at $112.49 | $ 674.94 |
| Monthly Payments from December 1, 2010 through March 1, 2011 at $2,015.48 | $ 8,061.92 |
| Late Charges at $97.49 | $ 389.96 |
| Accrued Late Charges | $ 1,651.86 |
| Escrow Shortage | $ 10,172.57 |
| Foreclosure Fees and Costs | $ 2,098.14 |
| Inspection Fees | $ 104.50 |
| NSF Fees | $ 44.00 |
| Total Reinstatement | $ 54,238.23 |

"TOTAL UNPAID PRINCIPAL PLUS REINSTATEMENT" $654,204.35

PROBER & RAPHAEL
ATTORNEYS FOR SECURED CREDITOR
P.O. Box 4365
Woodland Hills, CA 91365-4365
(818) 227-0100

## SPECIAL NOTICE

**THE FOLLOWING NOTICE IS GIVEN TO YOU IN THE EVENT THAT THE FEDERAL FAIR DEBT COLLECTIONS ACT APPLIES TO THIS COMMUNICATION.**

The following statement provides you with notice of certain rights which you may have by law. Nothing in this statement modifies or changes the hearing date or response time specified in the attached documents or your need to take legal action to protect your rights in this matter. No provision of the following statement modifies or removes your need to comply with local rules concerning the attached documents.

## CONSUMER DISCLOSURE

This communication is made in an attempt to collect on a debt or judgment and any information obtained will be used for that purpose.

Please be advised that if you notify U.S. Bank, N.A.'s attorneys within 30 days that all or a part of your obligation or judgment to U.S. Bank, N.A. is disputed, then U.S. Bank, N.A.'s attorneys will mail to you a written verification of the obligations or judgment and the amounts owed to U.S. Bank, N.A. . In addition and upon your request within 30 days, you will be provided with the name and address of the original creditor, if different from the current creditor.

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

I, Janice Warren, certify that I am a resident of the County aforesaid; I am over the age of 18 years and not a party to the within action; my business address is 20750 Ventura Boulevard, Suite 100, Woodland Hills, California 91364.

On April 29, 2011, I served the within CHAPTER 13 PROOF OF CLAIM on all interested parties in this proceeding by placing true and correct copy thereof enclosed in a sealed envelope with postage prepaid in the United States Mail at Woodland Hills, California, addressed as follows:

Carole DePuydt Meier
61 Rudgear Drive
Walnut Creek, CA 94596

Allison J. Wood, Esquire
1300 Clay Street, #600
Oakland, CA 94612

Martha G. Bronitsky
P. O. Box 5004
Hayward, CA 94540-5004

I declare that I am employed in the office of a member of the Bar at whose direction this service was made.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on April 29, 2011 at Woodland Hills, California.

/s/ Janice Warren

# ADJUSTABLE RATE NOTE

**(LIBOR Six-Month Index (As Published in *The Wall Street Journal*) - Rate Caps)**

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

| March 30, 2006 | Walnut Creek | CA |
|---|---|---|
| [Date] | [City] | [State] |

61 Rudgear Drive, Walnut Creek, CA 94596

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 600,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is Downey Savings and Loan Association, F.A.

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 5.125% beginning with my first monthly payment. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay a monthly payment of accrued interest only for the first 60 months of this loan by making a payment every month. Beginning on the 61st month, I will pay principal and interest by making a payment every month thereafter.

I will make my monthly payments on the first day of each month beginning on June 1, 2006.

I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on May 1, 2046, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 6060, 3501 Jamboree Rd, Newport Beach, CA 92658-6060 or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ 2,562.50. This amount may change.

MULTI STATE ADJUSTABLE RATE NOTE - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN *THE WALL STREET JOURNAL*) - Single Family

A106N1.UFF (09/07/04) CR22228 RG

Initials: CM

Page 1 of 4

Case 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 5 of 49

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may change on the first day of **November, 2006** , and on that day every six months thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 30 days before each Change Date is called the "Current Index."

If the index is no longer available, or is no longer published, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **two and three-quarters** percentage points (**2.750** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (.125%). Subject to the limits stated in Section 4(D) below, this amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **6.125** % or less than **4.125** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point(s) (1%) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than **11.500** %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If I make a partial Prepayment during the first sixty (60) months of this loan, my monthly payments due for the remaining portion of this sixty (60) month period will not change as a result of my Prepayment, but a portion of my monthly payments after my partial Prepayment may reduce the Principal. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

Case 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 6 of 49

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **Fifteen (15)** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000** % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

Carol Meier (Seal) -Borrower
CAROL MEIER

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

[Sign Original Only]

A106N4.UFF (09/07/04) CR22228 RG

# RIDER TO PROMISSORY NOTE AND SECURITY INSTRUMENT

Loan Numb ... ..........  Date: March 30, 2006

Property Address: 61 Rudgear Drive, Walnut Creek, CA 94596

This Rider is hereby incorporated into that certain deed of trust/mortgage (Security Instrument), and that certain promissory note (Note), both dated the same date as this Rider executed by Borrower in favor of Downey Savings and Loan Association, F.A. (Lender or Note Holder). Anyone who takes the Note by transfer and who is entitled to receive payments under the Note is also called the Note Holder. All capitalized terms used but not defined in this Rider shall have the same meaning as set forth in the Note and Security Instrument. To the extent that any provisions in this Rider are inconsistent with the Security Instrument and/or the Note, this Rider shall prevail. This Rider is secured by the Security Instrument.

If the Federal Home Loan Mortgage Corporation (FHLMC), the Federal National Mortgage Association (FNMA) or any other investor buys all or some of Lender's rights under the Security Instrument and the Note, the provisions of this Rider, may, at the investor's discretion, no longer have any force or effect. If thereafter FHLMC or FNMA or any other owner should retransfer the Security Instrument and Note to Lender or Lender's successor in interest, then this Rider shall thereupon be automatically reinstated, without any additional writing or document.

1. LATE CHARGES and ACCRUED INTEREST.

If any installment is not received by Note Holder within fifteen (15) days after its due date, Borrower shall pay Note Holder a late charge in an amount equal to six percent (6.000%) of the installment due that is applicable to the payment of principal and interest, or $5.00, whichever is greater. If the fifteen day period ends on a weekend or a holiday, the period is extended to the next business day. Borrower acknowledges that it would be difficult and impractical to fix Note Holder's actual damages arising out of any late payment and that the foregoing late payment charge is a reasonable estimate of the same and shall be presumed to be the actual amount. The provisions of this paragraph shall not limit Note Holder's right, under the Security Instrument or otherwise, to compel prompt performance under the Note. Upon default, accrued and unpaid interest shall further bear interest at the then applicable interest rate until paid.

If Borrower is assessed a late charge and sufficient funds are not available in Borrower's checking account when Lender attempts to debit Borrower's loan payment from Borrower's designated checking account, a "returned item charge" will be assessed in addition to the late charge.

2. INTEREST ON PAST DUE SUMS.

If any sum due under the Note is not paid in accordance with the terms of the Note, including accumulated interest, then the sum(s) not paid shall bear interest at the same rate as the principal, or six percent (6.0%) plus the Bank of America Prime rate as publicly announced by the Bank of America National Trust and Savings Association, a National Association as its 'Referenced Rate', whichever is higher, in order to compensate Lender for its enforcement costs arising from the default. In the event the Index ceases to be published, then Note Holder may select a similar alternative published Index over which the Note Holder has no control, in which case such alternative index shall become the Index.

Case 11-42880 Doc# 65-1 Filed: 09/19/11 Entered: 09/19/11 20:37:29 Page 9 of 49

Case 11-42880 Claim 6-1 Filed: 04/29/11 Desc Main Document Page 9 of 49

3. NOTE HOLDER'S TREATMENT OF PAYMENTS.

Except as otherwise required by law, Note Holder may apply all payments accepted by Note Holder to any outstanding obligations of Borrower under the Loan Documents in any order or priority Note Holder elects in its sole and absolute discretion. Note Holder may disregard any designation or notation by Borrower (or anyone acting on Borrower's behalf) as to how a payment is to be applied by Note Holder. If Note Holder elects not to accept a payment as permitted under Section 1 of the Security Instrument, Note Holder may return the payment to Borrower regardless of who tendered payment, and in such event, Note Holder shall not have any liability to Borrower or any third party as a result thereof. Borrower shall indemnify, defend, protect and hold Note Holder harmless, from and against all claims, damages, expenses, losses and liabilities, in whatever form, suffered or incurred by Note Holder as a result of Note Holder's return of a payment to Borrower.

4. EVENTS OF DEFAULT; REMEDIES.

The following shall constitute additional events of default under the Security Instrument:

(A) Any person's attempt to reconvey Note Holder's interest in the Property without Note Holder's prior written consent;

(B) Any person's attempt to have the Note, Security Instrument, this Rider or any of the other Loan Documents declared invalid or unenforceable;

(C) Failure to pay when due any sum due under any of the Loan Documents;

(D) Any default under any provision of the Security Instrument; or

(E) Borrower default under any other deed of trust or other instrument secured by the Property.

Note Holder may use in-house counsel or retain outside lawyers to analyze and respond to any event of default, and Note Holder may charge Borrower reasonable attorneys' fees and costs for such analysis and response. Note Holder may add these legal expenses to the Note and/or demand immediate reimbursement from Borrower. Borrower's failure to promptly reimburse Note Holder shall also constitute an event of default under the Security Instrument.

Upon the occurrence of any events of default, all sums secured by the Security Instrument (including all of Note Holder's attorneys' fees and costs) shall at once become due and payable at the option of Note Holder with or without prior notice by Note Holder and regardless of any prior forbearance. In such event Note Holder, at its option, may then or thereafter deliver to the Trustee a written declaration of default and demand to sell the Property and shall cause to be filed of record a written notice of default and election to cause the Property to be sold. Note Holder shall also deposit with the Trustee the Security Instrument and any notes and all documents evidencing expenditures secured thereby. After the lapse of such time as then may be required by law following recordation of such notice of default, and notice of sale having been given as then required by law, the Trustee, without demand on Borrower, shall sell the Property at the time and place specified by such Trustee in such notice of sale, or at the time to which such noticed sale has been duly postponed, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale, except that Note Holder may credit bid at the sale to the extent of the amount owing under the Loan Documents, including the Trustee's fee and expenses. The Trustee may sell the Property as a whole or in separate parcels if there is more than one parcel, subject to such rights as Borrower may have by law to direct the manner or order of sale, or by such other manner of sale which is authorized by law. The Trustee may postpone the sale of all or any portion of the Property by public declaration made by the Trustee at the time and place last appointed for sale. If the Property is sold, the Trustee shall deliver to the purchaser a deed conveying the Property so sold, but without any covenant or warranty, express or implied. The recital in such deed of any matters of fact shall be conclusive proof of the truthfulness thereof.

Case: 11-42880 Doc# 65-1 Filed: 09/19/11 Entered: 09/19/11 20:37:29 Page 10 of 49

Case: 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 10 of 49

Any person, including Borrower, the Trustee or Note Holder may purchase at such sale. After deducting all costs, fees and expenses of the Trustee, including costs of evidence of title in connection with such sale, the Trustee shall apply the remaining proceeds of sale first to payment of all sums expended under the terms of the Security Instrument not yet repaid, with accrued interest at the rate then payable under the Note or notes secured thereby, and then to payment of all other sums secured thereby (including the Note). If there be any proceeds remaining, the Trustee shall distribute them to the person or persons legally entitled thereto.

5. HAZARD OR PROPERTY INSURANCE.

Unless Note Holder and Borrower otherwise agree in writing, any insurance proceeds shall be applied first to reimburse Note Holder for costs and expenses incurred in connection with obtaining any such insurance proceeds, and then, at Note Holder's option, in such order and proportion as it may determine in its sole and absolute discretion, and regardless of any impairment of security or lack thereof: (i) to the sums secured by the Security Instrument, whether or not then due, and to such components thereof as Note Holder may determine in its sole and absolute discretion; and/or (ii) to Borrower to pay the costs and expenses of necessary repairs or restoration of the Property to a condition satisfactory to Note Holder. If Borrower abandons the Property, or does not answer within 30 days a notice from Note Holder that the insurance carrier has offered to settle a claim, then Note Holder may collect the insurance proceeds. Note Holder may, in its sole and absolute discretion, and regardless of any impairment of security or lack thereof, use the proceeds to repair or restore the Property or to pay the sums secured by the Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

If Borrower obtains earthquake insurance, and other hazard insurance, or any other insurance on the Property and such insurance is not specifically required by Note Holder, then (i) Borrower must ensure that such insurance names Note Holder as loss payee and (ii) such insurance shall be subject to this paragraph with respect to use of insurance proceeds.

Note Holder may charge a reasonable fee for the cost of determining whether the building or mobile home securing a loan is located in an area having special flood hazards, subject to applicable law.

Case: 11-42880 Doc# 65-1 Filed: 09/19/11 Entered: 09/19/11 20:37:29 Page 11 of 49

Case 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 11 of 49

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Rider.

CAROL MEIER _____(Seal) -Borrower

_____(Seal) -Borrower

_____(Seal) -Borrower

_____(Seal) -Borrower

_____(Seal) -Borrower

_____(Seal) -Borrower

_____(Seal) -Borrower

_____(Seal) -Borrower

Case: 11-42880 Doc# 65-1 Filed: 09/19/11 Entered: 09/19/11 20:37:29 Page 12 of 49

Case 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 12 of 49

RECORDING REQUESTED BY
TICOR TITLE COMPANY

21

Recording Requested By:
Downey Savings and Loan Association, F.A.
Return To:
Downey Savings and Loan Association, F.A.
P.O. Box 6060, 3501 Jamboree Rd, Newport Beach, CA 92658-6060

Prepared By:
Downey Savings and Loan Association, F.A.
P.O. Box 6060, 3501 Jamboree Rd,
Newport Beach, CA 92658-6060
20 2200055

CONTRA COSTA Co Recorder Office
STEPHEN L. WEIR, Clerk-Recorder
DOC- 2006-0105478-00
Acct 1-Ticor Title Company
Thursday, APR 06, 2006 08:00:00

| MIC | $1.00 | MOD | $27.00 | REC | $31.00 |
|---|---|---|---|---|---|
| TCF | $26.00 | DAF | $1.80 | REF | $0.20 |

Ttl Pd $87.00 Nbr-0003188133
cgv/R2/1-27

[Space Above This Line For Recording Data]

# DEED OF TRUST

Title Order No.
Escrow No.: 06-202200055
APN:

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated March 30, 2006 CM , together with all Riders to this document.

(B) "Borrower" is CAROL MEIER, A Married Woman as her sole and separate property

Borrower's address is 61 Rudgear Drive, Walnut Creek CA 94596
. Borrower is the trustor under this Security Instrument.

(C) "Lender" is Downey Savings and Loan Association, F.A.

Lender is a federally chartered savings association organized and existing under the laws of the United States of America .

Case: 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 13 of 49

Lender's address is 3501 Jamboree Road, Newport Beach, CA 92660

Lender is the beneficiary under this Security Instrument.

(D) "Trustee" is DSL Service Company, A California Corporation

(E) "Note" means the promissory note signed by Borrower and dated March 30, 2006. The Note states that Borrower owes Lender six hundred thousand and 00/100 Dollars (U.S. $600,000.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than May 1, 2046.

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider [ ] Condominium Rider [ ] Second Home Rider
[ ] Balloon Rider [ ] Planned Unit Development Rider [X] 1-4 Family Rider
[ ] VA Rider [ ] Biweekly Payment Rider [X] Other(s) [specify]
Rider to Promissory Note and Security Instrument

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

Initials: CM

Case: 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 14 of 49

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County [Type of Recording Jurisdiction] of Contra Costa [Name of Recording Jurisdiction]:

LOT 226, MAP OF SANS CRAINTE UNIT NO. 4, FILED APRIL 29, 1946, MAP BOOK 29, PAGE 10, CONTRA COSTA COUNTY RECORDS

Parcel ID Number: which currently has the address of
61 Rudgear Drive [Street]
Walnut Creek [City], California 94596 [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

Case 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 5 of 15

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be



Case: 11-42880 Doc# 65-1 Filed: 09/19/11 Entered: 09/19/11 20:37:29 Page 16 of 49
Claim 6-1 Filed 04/29/11 Desc Main Document Page 16 of 49

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

Case: 11-42880 Doc# 65-1 Filed: 09/19/11 Entered: 09/19/11 20:37:29 Page 17 of 49
Case: 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 17 of 49

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

Case: 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 18 of 49

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

Case 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 19 of 49

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

Case: 11-42880 Doc# 65-1 Filed: 09/19/11 Entered: 09/19/11 20:37:29 Page 20 of 49
Case: 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 20 of 49

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

Case: 11-42880 Doc# 65-1 Filed: 09/19/11 Entered: 09/19/11 20:37:29 Page 21 of 49

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials: CM

Case: 11-42880 Doc# 65-1 Filed: 09/19/11 Entered: 09/19/11 20:37:29 Page 22 of 49

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

Initials: CM

Case: 11-42880 Doc# 65-1 Filed: 09/19/11 Entered: 09/19/11 20:37:29 Page 23 of 49
Case 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 23 of 49

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Case: 11-42880 Doc# 65-1 Filed: 09/19/11 Entered: 09/19/11 20:37:29 Page 24 of 49

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

Initials: CM

Case: 11-42880 Doc# 65-1 Filed: 09/19/11 Entered: 09/19/11 20:37:29 Page 25 of 49

106478

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_________________________

_________________________ (Seal)
CAROL MEIER -Borrower

_________________________

_________________________ (Seal)
-Borrower

_________________________ (Seal)
-Borrower

_________________________ (Seal)
-Borrower

_________________________ (Seal)
-Borrower

_________________________ (Seal)
-Borrower

_________________________ (Seal)
-Borrower

_________________________ (Seal)
-Borrower

Case: 11-42880 Doc# 65-1 Filed: 09/19/11 Entered: 09/19/11 20:37:29 Page 26 of 49
Case 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 26 of 49

State of California
County of CONTRA COSTA } ss.

On MARCH 31, 2006 before me, GERALD SCHAFFNER, NOTARY personally appeared

CAROL MEIER

, ~~personally known to me~~ (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

GERALD SCHAFFNER
COMM. #1508618
NOTARY PUBLIC • CALIFORNIA
ALAMEDA COUNTY
Comm. Exp. SEPT. 16, 2008

(Seal)

Initials: CM

Case: 11-42880 Doc# 65-1 Filed: 09/19/11 Entered: 09/19/11 20:37:29 Page 27 of 49
Case 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 27 of 49

## RIDER TO PROMISSORY NOTE AND SECURITY INSTRUMENT

Loan Numbe: Date: March 30, 2006

Property Address: 61 Rudgear Drive, Walnut Creek, CA 94596

This Rider is hereby incorporated into that certain deed of trust/mortgage (Security Instrument), and that certain promissory note (Note), both dated the same date as this Rider executed by Borrower in favor of Downey Savings and Loan Association, F.A. (Lender or Note Holder). Anyone who takes the Note by transfer and who is entitled to receive payments under the Note is also called the Note Holder. All capitalized terms used but not defined in this Rider shall have the same meaning as set forth in the Note and Security Instrument. To the extent that any provisions in this Rider are inconsistent with the Security Instrument and/or the Note, this Rider shall prevail. This Rider is secured by the Security Instrument.

If the Federal Home Loan Mortgage Corporation (FHLMC), the Federal National Mortgage Association (FNMA) or any other investor buys all or some of Lender's rights under the Security Instrument and the Note, the provisions of this Rider, may, at the investor's discretion, no longer have any force or effect. If thereafter FHLMC or FNMA or any other owner should retransfer the Security Instrument and Note to Lender or Lender's successor in interest, then this Rider shall thereupon be automatically reinstated, without any additional writing or document.

1. LATE CHARGES and ACCRUED INTEREST.

If any installment is not received by Note Holder within fifteen (15) days after its due date, Borrower shall pay Note Holder a late charge in an amount equal to six percent (6.000%) of the installment due that is applicable to the payment of principal and interest, or $5.00, whichever is greater. If the fifteen day period ends on a weekend or a holiday, the period is extended to the next business day. Borrower acknowledges that it would be difficult and impractical to fix Note Holder's actual damages arising out of any late payment and that the foregoing late payment charge is a reasonable estimate of the same and shall be presumed to be the actual amount. The provisions of this paragraph shall not limit Note Holder's right, under the Security Instrument or otherwise, to compel prompt performance under the Note. Upon default, accrued and unpaid interest shall further bear interest at the then applicable interest rate until paid.

If Borrower is assessed a late charge and sufficient funds are not available in Borrower's checking account when Lender attempts to debit Borrower's loan payment from Borrower's designated checking account, a "returned item charge" will be assessed in addition to the late charge.

2. INTEREST ON PAST DUE SUMS.

If any sum due under the Note is not paid in accordance with the terms of the Note, including accumulated interest, then the sum(s) not paid shall bear interest at the same rate as the principal, or six percent (6.0%) plus the Bank of America Prime rate as publicly announced by the Bank of America National Trust and Savings Association, a National Association as its 'Referenced Rate', whichever is higher, in order to compensate Lender for its enforcement costs arising from the default. In the event the Index ceases to be published, then Note Holder may select a similar alternative published index over which the Note Holder has no control, in which case such alternative index shall become the Index.

Case: 11-42880 Claim 65-1 Filed: 04/29/11 Desc Main Document Page 28 of 49

Case: 11-42880 Doc# 65 Filed: 09/19/11 Entered: 09/19/11 20:37:29 Page 28 of 49

3. NOTE HOLDER'S TREATMENT OF PAYMENTS.

Except as otherwise required by law, Note Holder may apply all payments accepted by Note Holder to any outstanding obligations of Borrower under the Loan Documents in any order or priority Note Holder elects in its sole and absolute discretion. Note Holder may disregard any designation or notation by Borrower (or anyone acting on Borrower's behalf) as to how a payment is to be applied by Note Holder. If Note Holder elects not to accept a payment as permitted under Section 1 of the Security Instrument, Note Holder may return the payment to Borrower regardless of who tendered payment, and in such event, Note Holder shall not have any liability to Borrower or any third party as a result thereof. Borrower shall indemnify, defend, protect and hold Note Holder harmless, from and against all claims, damages, expenses, losses and liabilities, in whatever form, suffered or incurred by Note Holder as a result of Note Holder's return of a payment to Borrower.

4. EVENTS OF DEFAULT; REMEDIES.

The following shall constitute additional events of default under the Security Instrument:

(A) Any person's attempt to reconvey Note Holder's interest in the Property without Note Holder's prior written consent;

(B) Any person's attempt to have the Note, Security Instrument, this Rider or any of the other Loan Documents declared invalid or unenforceable;

(C) Failure to pay when due any sum due under any of the Loan Documents;

(D) Any default under any provision of the Security Instrument; or

(E) Borrower default under any other deed of trust or other instrument secured by the Property.

Note Holder may use in-house counsel or retain outside lawyers to analyze and respond to any event of default, and Note Holder may charge Borrower reasonable attorneys' fees and costs for such analysis and response. Note Holder may add these legal expenses to the Note and/or demand immediate reimbursement from Borrower. Borrower's failure to promptly reimburse Note Holder shall also constitute an event of default under the Security Instrument.

Upon the occurrence of any events of default, all sums secured by the Security Instrument (including all of Note Holder's attorneys' fees and costs) shall at once become due and payable at the option of Note Holder with or without prior notice by Note Holder and regardless of any prior forbearance. In such event Note Holder, at its option, may then or thereafter deliver to the Trustee a written declaration of default and demand to sell the Property and shall cause to be filed of record a written notice of default and election to cause the Property to be sold. Note Holder shall also deposit with the Trustee the Security Instrument and any notes and all documents evidencing expenditures secured thereby. After the lapse of such time as then may be required by law following recordation of such notice of default, and notice of sale having been given as then required by law, the Trustee, without demand on Borrower, shall sell the Property at the time and place specified by such Trustee in such notice of sale, or at the time to which such noticed sale has been duly postponed, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale, except that Note Holder may credit bid at the sale to the extent of the amount owing under the Loan Documents, including the Trustee's fee and expenses. The Trustee may sell the Property as a whole or in separate parcels if there is more than one parcel, subject to such rights as Borrower may have by law to direct the manner or order of sale, or by such other manner of sale which is authorized by law. The Trustee may postpone the sale of all or any portion of the Property by public declaration made by the Trustee at the time and place last appointed for sale. If the Property is sold, the Trustee shall deliver to the purchaser a deed conveying the Property so sold, but without any covenant or warranty, express or implied. The recital in such deed of any matters of fact shall be conclusive proof of the truthfulness thereof.

Case: 11-42880 Doc# 65-1 Filed: 09/19/11 Entered: 09/19/11 20:37:29 Page 29 of 49
Case 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 29 of 49

Any person, including Borrower, the Trustee or Note Holder may purchase at such sale. After deducting all costs, fees and expenses of the Trustee, including costs of evidence of title in connection with such sale, the Trustee shall apply the remaining proceeds of sale first to payment of all sums expended under the terms of the Security Instrument not yet repaid, with accrued interest at the rate then payable under the Note or notes secured thereby, and then to payment of all other sums secured thereby (including the Note). If there be any proceeds remaining, the Trustee shall distribute them to the person or persons legally entitled thereto.

5. HAZARD OR PROPERTY INSURANCE.

Unless Note Holder and Borrower otherwise agree in writing, any insurance proceeds shall be applied first to reimburse Note Holder for costs and expenses incurred in connection with obtaining any such insurance proceeds, and then, at Note Holder's option, in such order and proportion as it may determine in its sole and absolute discretion, and regardless of any impairment of security or lack thereof: (i) to the sums secured by the Security Instrument, whether or not then due, and to such components thereof as Note Holder may determine in its sole and absolute discretion; and/or (ii) to Borrower to pay the costs and expenses of necessary repairs or restoration of the Property to a condition satisfactory to Note Holder. If Borrower abandons the Property, or does not answer within 30 days a notice from Note Holder that the insurance carrier has offered to settle a claim, then Note Holder may collect the insurance proceeds. Note Holder may, in its sole and absolute discretion, and regardless of any impairment of security or lack thereof, use the proceeds to repair or restore the Property or to pay the sums secured by the Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

If Borrower obtains earthquake insurance, and other hazard insurance, or any other insurance on the Property and such insurance is not specifically required by Note Holder, then (i) Borrower must ensure that such insurance names Note Holder as loss payee and (ii) such insurance shall be subject to this paragraph with respect to use of insurance proceeds.

Note Holder may charge a reasonable fee for the cost of determining whether the building or mobile home securing a loan is located in an area having special flood hazards, subject to applicable law.

Case: 11-42880 Doc# 65-1 Filed: 09/19/11 Entered: 09/19/11 20:37:29 Page 30 of 49
Case 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 30 of 49

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Rider.

CAROL MEYER (Seal) -Borrower

(Seal) -Borrower

(Seal) -Borrower

(Seal) -Borrower

(Seal) -Borrower

(Seal) -Borrower

(Seal) -Borrower

(Seal) -Borrower

Case: 11-42880 Doc# 65-1 Filed: 09/19/11 Entered: 09/19/11 20:37:29 Page 31 of 49

Case 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 31 of 49

106478

# ADJUSTABLE RATE RIDER

**(LIBOR Six-Month Index (As Published in *The Wall Street Journal*) - Rate Caps)**

THIS ADJUSTABLE RATE RIDER is made this **30th** day of **March, 2006**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to **Downey Savings and Loan Association, F.A.**

("Lender") of the same date and covering the property described in the Security Instrument and located at:

**61 Rudgear Drive, Walnut Creek, CA 94596**

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for interest to be charged on unpaid principal until the full amount of Principal has been paid. Interest shall be paid at a yearly rate of **5.125 %** beginning with my first monthly payment. The Note provides for changes in the interest rate and the monthly payments, as follows:

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may change on the first day of **November, 2006**, and on that day every six months thereafter. Each date on which my interest rate could change is called a "Change Date."

**MULTI STATE ADJUSTABLE RATE RIDE-LIBOR SIX-MONTH INDEX (AS PUBLISHED IN *THE WALL STREET JOURNAL*) - Single Family**

A106RI.UFF (09/09/04) CR22228 RG

Page 1 of 4

Initials CM

Case: 11-42880 Doc# 65-1 Filed: 09/19/11 Entered: 09/19/11 20:37:29 Page 32 of 49

Case 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 32 of 49

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 30 days before each Change Date is called the "Current Index."

If the Index is no longer available, or is no longer published, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **two and three-quarters** percentage points (**2.750 %**) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (.125%). Subject to the limits stated in Section 4(D) below, this amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **6.125 %** or less than **4.125 %**. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point(s) (1%) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than **11.500 %**.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

Case: 11-42880 Doc# 65-1 Filed: 09/19/11 Entered: 09/19/11 20:37:29 Page 33 of 49

Case 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 33 of 49

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Case: 11-42880 Doc# 65-1 Filed: 09/19/11 Entered: 09/19/11 20:37:29 Page 34 of 49
Case: 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 34 of 49

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____(Seal) CAROL MEIER -Borrower

_____(Seal) -Borrower

_____(Seal) -Borrower

_____(Seal) -Borrower

_____(Seal) -Borrower

_____(Seal) -Borrower

_____(Seal) -Borrower

_____(Seal) -Borrower

[Sign Original Only]

Case: 11-42880 Doc# 65-1 Filed: 09/19/11 Entered: 09/19/11 20:37:29 Page 35 of 49
Case 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 35 of 49

# 1-4 FAMILY RIDER
**(Assignment of Rents)**

THIS 1-4 FAMILY RIDER is made this **30th** day of **March, 2006,** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to **Downey Savings and Loan Association, F.A.**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

**61 Rudgear Drive, Walnut Creek, CA 94596**

[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

Case: 11-42880 Doc# 65-1 Filed: 09/19/11 Entered: 09/19/11 20:37:29 Page 36 of 49
Case: 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 36 of 49

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**THE FOLLOWING TERMS AND PROVISIONS** shall be applicable only at such time as the Property is no longer owner-occupied.

**D. OCCUPANCY.** Section 6 of the Security Instrument is deleted.

**E. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph E, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**F. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

Case: 11-42880 Doc# 65-1 Filed: 09/19/11 Entered: 09/19/11 20:37:29 Page 37 of 49
Case 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 37 of 49

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents, any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9 of the Security Instrument.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**G. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

[signature] (Seal) -Borrower
CAROL MEIER

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

**LEGAL DESCRIPTION**

**EXHIBIT "A"**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF WALNUT CREEK, COUNTY OF CONTRA COSTA, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

Lot 226, map of Sans Crainte Unit No. 4, filed April 29, 1946, Map Book 29, page 10, Contra Costa County Records.

APN: 187-032-011

End of Document

Case: 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 39 of 49

**ASSIGNMENT AND ASSUMPTION OF INTERESTS AND OBLIGATIONS**

THIS ASSIGNMENT AND ASSUMPTION OF INTERESTS AND OBLIGATIONS ("Assignment") is made and entered into as of the 20th day of April, 2009 by and between the Federal Deposit Insurance Corporation as Receiver for Downey Savings & Loan Association, F.A. ("Assignor") and U.S Bank National Association ("Assignee").

Whereas, Assignor and Assignee have entered into that certain Loan Sale Agreement dated November 21, 2008 (the "LSA"), pursuant to which Assignor has agreed to sell, assign, transfer and convey to Assignee all the assets identified on Exhibit A attached to this Agreement (the "Assets").

Whereas, pursuant to a Bill of Sale of even date herewith, Assignor has conveyed to Assignee that part of the Assets which consists of tangible personal property.

Whereas, part of the Assets may consist of documents and instruments evidencing loans (including without limitation, promissory notes, loan agreements, shared credit or participation agreements, inter-creditor agreements, letters of credit, reimbursement agreements, drafts, bankers' acceptances, transmission system confirmations of transaction and other evidences of indebtedness, including loan histories, affidavits, general collection information, correspondence and comments pertaining to such obligations), and equipment leases (the "Agreements to Pay").

Whereas, another part of the Assets may consist of documents securing Agreements to Pay, such as mortgages, deeds of trust, security agreements, loan agreements and other documents or instruments of similar nature relating to the Agreements to Pay (the "Collateral Documents").

Whereas, another part of the Assets may consist of real estate, Contracts for Deed to real estate, and leases, tenancies, concessions, licenses and other rights of occupancy or use related to real estate (including any security deposits relating thereto in Assignor's possession) (the "Real Estate Interests").

Whereas, another part of the Assets may be affected by contracts relating to the Assets, such as collection and service agreements (the "Miscellaneous Agreements"). The term "Miscellaneous Agreements" does not include loan servicing agreements between Assignor and independent contractors.

Whereas, under the LSA, Assignor has agreed to assign and convey to Assignee all of Assignor's right, title and interest to the Agreements to Pay, the Collateral Documents, the Real Estate Interests and the Miscellaneous Agreements related to the Assets.

Whereas, Assignee has agreed to accept and assume all of Assignor's duties, obligations and liabilities under the Agreements to Pay, Collateral Documents, Real Estate Interests and Miscellaneous Agreements related to the Assets (the "Obligations").

Whereas, the term "Advances" as used herein means the sum of all unreimbursed amounts advanced by or on behalf of the failed institution(s) which once owned the Assets (i) to

protect the noteholder's lien position or the collateral, including payment of ad valorem taxes and hazard and forced placed insurance as permitted by the terms of any loan, or (ii) to meet required scheduled payments. The term "Advances" does not include (A) incremental funding of loan proceeds under an Agreement to Pay, such as in the case of a revolving credit loan or a construction loan, or (B) the payment of appraisal fees, broker opinion fees, attorney fees and associated legal fees, foreclosure fees, trustee fees, property inspection fees, property preservation and operating cost fees, tax penalties, title policies, lien search fees, or any other cost that can be directly associated with the collection and servicing of a loan.

NOW THEREFORE, in consideration of the foregoing and the sum of ten dollars ($10.00), and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1. Assignor's Assignment. Assignor hereby transfers, grants, conveys and assigns to Assignee all of Assignor's right, title and interest in the Agreements to Pay, the Collateral Documents, the Real Estate Interests and the Miscellaneous Agreements.

2. Assignee's Acceptance. Assignee does hereby accept such assignment from Assignor and assumes all Obligations arising from and after the date hereof. The Obligations assumed include, without limitation, any and all obligations to (i) make payments relating to Agreements to Pay serviced by Assignor; (ii) make Advances with respect to Agreements to Pay serviced by Assignor, (iii) reimburse third party servicers for Advances on Agreements to Pay, and (iv) make incremental disbursements of loan proceeds, such as in the case of a revolving credit loan or a construction loan.

3. Assignee's Covenants regarding Securities Law. Assignee hereby represents and warrants to, and covenants with Assignor as follows:

a. Assignee understands that (a) neither the Assets, nor any interest therein or evidence thereof, has been registered or qualified under the Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any state or any other jurisdiction, and (b) the Assignor is not required, and does not intend, to so register or qualify the Assets.

b. Assignee is a substantial, sophisticated investor having such knowledge and experience in financial and business matters, and in particular in matters relating to the purchase, sale, origination or ownership of notes and loan participations such as the Assets, that it is capable of evaluating the merits and risks of investment in the Assets and understands and is able to bear the economic risks of such an investment (including a total loss of its investment and the risk that Assignee might be required to hold the Assets for an indefinite period of time).

c. Assignee is acquiring the Assets for investment, for its own account, and not for or on account of any other person or entity, and not with a view to or for sale in connection with a distribution within the meaning of Section 5 of the Securities Act.

Case: 11-42880 Doc# 65-1 Filed: 09/19/11 Entered: 09/19/11 20:37:29 Page 41 of 49
Case: 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 41 of 49

d. Assignee has been furnished with, and has had an opportunity to review and understands, all information relating to the Assets as has been requested and as is considered necessary by Assignee, and has had all questions arising from or relating to such review answered to the satisfaction of Assignee.

e. Neither Assignee nor anyone acting on its behalf has (i) offered, transferred, pledged, sold or otherwise disposed of any of the Assets (or any interest therein or evidence thereof) or, (ii) solicited any offer to buy or accept a transfer, pledge or other disposition of any of the Assets (or any interest therein or evidence thereof) from, or (iii) otherwise approached or negotiated with respect to any of the Assets (or any other interest therein or evidence thereof) with any person or entity in any manner, or taken any other action that would constitute a distribution under, or render the disposition to Assignee or the disposition by Assignee to any other party of any of the Assets (or any interest therein or evidence thereof) a violation of the Securities Act or of any other securities law or require registration or qualification pursuant thereto, nor will it act, nor has it authorized or will it authorize any person or entity to so act, in any such manner with respect to the Assets (or any interest therein or evidence thereof).

f. Either (i) Assignee is not an employee benefit plan within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or a plan within the meaning of Section 4975(e)(l) of the Internal Revenue Code, and Assignee is not, directly or indirectly, purchasing the Assets on behalf of, as investment manager of, as named fiduciary of, as trustee of or with assets of any such plan; or (ii) Assignee's purchase of the Assets (A) will not cause Assignor to be deemed a fiduciary of any such plan, or (B) either will not result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Internal Revenue Code or will be exempt from the prohibited transaction rules in Section 406 of ERISA and Section 4975 of the Internal Revenue Code.

4. Assignee's Indemnification. Assignee hereby indemnifies and holds harmless and agrees to defend Assignor, the failed bank, and Assignor's agents and employees (the "Indemnified Parties") from and against any and all damages, liabilities, losses, costs, charges, liens, deficiencies and expenses of any nature (including, without limitation, reasonable attorneys' fees and all other actual litigation costs) suffered or incurred by or assessed against the Indemnified Parties from and after the date hereof as a result of (i) Assignee's failure to perform the assumed Obligations, or (ii) Assignee's failure to pay the assumed liabilities identified in Section 2 above, or (iii) Assignee's breach of any representation, warranty or covenant contained in this Assignment.

5. Beneficiaries of this Assignment. This Assignment shall be binding upon and shall inure to the benefit of Assignor and Assignee and their respective successors and

assigns, and the Federal Deposit Insurance Corporation in its corporate capacity shall be a third-party beneficiary with respect hereto.

6. Incorporation of terms of LSA. This Assignment is made, executed and delivered pursuant to the LSA, and is subject to all of the terms, provisions and conditions thereof.

7. Controlling Law. Federal law of the United States shall control this Agreement. To the extent that federal law does not supply a rule of decision, this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York. Nothing in this Agreement will require any unlawful action or inaction by either party.

8. Counterparts. This Assignment may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

IN WITNESS WHEREOF, each of the parties has caused this Assignment and Assumption of Interests and Obligations to be executed and delivered by its duly authorized officer or agent as of the day and year first written above.

**ASSIGNOR:**

FEDERAL DEPOSIT INSURANCE CORPORATION as RECEIVER for DOWNEY SAVINGS & LOAN ASSOCIATION, F.A.

By: ______________________
Name: JIM PHILLIPS
Witness

By: ______________________
Name: Steven A Carr
Title: Attorney-in-Fact

**ASSIGNEE:**

U.S. BANK NATIONAL ASSOCIATION

By: ______________________
Name: ______________________
Witness

By: ______________________
Name: Terrance R. Dolan
Title: Executive Vice President & Controller

**ACKNOWLEDGMENT**

STATE OF Texas )
)
COUNTY OF Dallas )

Before me, the undersigned authority, a Notary Public in and for the county and state aforesaid, on this day personally appeared Steven A Carr, known to me to be the person whose name is subscribed to the foregoing instrument, as Receiver of Downey Savings & Loan Association FA, and acknowledged to me that s/he executed the same as the act of the Receiver ____________________, for the purposes and consideration therein expressed, and in the capacity therein stated.

Given under my hand and seal of office on this the 14th day of April, 2009.

Cassandra T. Knighton
Notary Public
My Commission expires: Jan. 11, 2010

CASSANDRA TERESA KNIGHTON
MY COMMISSION EXPIRES
January 11, 2010

Case 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 45 of 49

IN WITNESS WHEREOF, each of the parties has caused this Assignment and Assumption of Interests and Obligations to be executed and delivered by its duly authorized officer or agent as of the day and year first written above.

**ASSIGNOR:**

FEDERAL DEPOSIT INSURANCE CORPORATION as RECEIVER for DOWNEY SAVINGS & LOAN ASSOCIATION, F.A.

By: ______________________
Name: ______________________
Witness

By: ______________________
Name: ______________________
Title: Attorney-in-Fact

**ASSIGNEE:**

U.S. BANK NATIONAL ASSOCIATION

By: ______________________
Name: Karen J. Canon
Witness

By: ______________________
Name: Terrance R. Dolan
Title: Executive Vice President & Controller

**ACKNOWLEDGMENT**

STATE OF Minnesota )
)
COUNTY OF Hennepin )

Before me, the undersigned authority, a Notary Public in and for the county and state aforesaid, on this day personally appeared Terrance R. Dolan, known to me to be the person whose name is subscribed to the foregoing instrument, as EVP/Controller of U.S. Bank National Association, and acknowledged to me that s/he executed the same as the act of the U.S. Bank National Association, for the purposes and consideration therein expressed, and in the capacity therein stated.

Given under my hand and seal of office on this the 17 day of April, 2009.

Notary Public

My Commission expires: 1/31/2010

RECORDING REQUESTED BY

U.S. Bank National Association

WHEN RECORDED MAIL TO:

U.S. Bank National Association
Attn: Compliance
3121 Michelson Drive, 5th Floor
Irvine, CA 92612

SPACE ABOVE THIS LINE FOR RECORDER'S USE

# AFFIDAVIT OF THE FEDERAL DEPOSIT INSURANCE CORPORATION

I, Steven A. Carr, having been first duly sworn, hereby make this Affidavit and state that:

1. I am an authorized representative of the Federal Deposit Insurance Corporation ("FDIC"), an agency of the United States government.

2. On November 21, 2008, Downey Savings and Loan Association, F.A. ("Downey Savings") was closed by the Office of Thrift Supervision and the FDIC was appointed as receiver.

3. As authorized by Section 11(d)(2)(G)(i)(II) of the Federal Deposit Insurance Act, 12 U.S.C. Section1821(d)(2)(G)(i)(II), the FDIC as receiver for Downey Savings may transfer any asset or liability of Downey Savings without any approval, assignment or consent with respect to such transfer.

4. Pursuant to the terms and conditions of a Purchase and Assumption Agreement between the FDIC as receiver for Downey Savings and U.S. Bank National Association ("U.S. Bank"), dated November 21, 2008 ("Purchase and Assumption Agreement"), U.S. Bank acquired certain of the assets, including all loans and all loan commitments, of Downey Savings.

5. As a result, on November 21, 2008 U.S. Bank became the owner of the loans and loan commitments of Downey Savings by operation of law.

Executed this 28 day of October 2009 at Dallas, Texas.

Steven A. Carr
Receiver in Charge for FDIC as Receiver for Downey Savings and Loan Association, F.A.

I HEREBY CERTIFY THIS TO BE A TRUE AND EXACT COPY OF THE ORIGINAL
Dated: 4/20/10
U.S. Bank National Association
By : [signature]
Name : RICHARD B. SIDWNEY
Title : Vice President

Case 11-42880 Claim 6-1 Filed 04/29/11 Desc Main Document Page 48 of 49

STATE OF TEXAS )
) ss.
COUNTY OF DALLAS )

On October 28, 2009, before me, Deborah Kay Miller, personally appeared Steven A. Carr, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument, the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Texas that the foregoing paragraph is true and correct.

WITNESS my hand and official seal. (Seal or Stamp)

Signature: Deborah Kay Miller
My Commission expires: 03-28-2011
My Commission number: ____________

NOTARY PUBLIC STATE OF TEXAS
DEBORAH KAY MILLER
NOTARY PUBLIC
State of Texas
Comm. Exp. 03-28-2011